UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| HILLCREST RIVERSIDE, INC., | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 09-0018 (RMU) |
| | : | | |
| v. | : | Re Document Nos.: | 12, 14 |
| | : | | |
| KATHLEEN SEBELIUS, in her official capacity as Secretary of the Department of Health and Human Services, | : : : | | |
| | : | | |
| Defendant. | : | | |

# MEMORANDUM OPINION

### Denying the Plaintiff's Motion for Summary Judgment;
### Granting the Defendant's Cross-Motion for Summary Judgment

## I. INTRODUCTION

This matter comes before the court on the plaintiff's motion for summary judgment and the defendant's cross-motion for summary judgment. On September 30, 2008, the Provider Reimbursement Review Board ("PRRB") of the Department of Health and Human Services issued an administrative ruling that required the plaintiff, the former owner and operator of a hospital in Tulsa, Oklahoma, to repay approximately $2.5 million to the Medicare program. The plaintiff commenced this action challenging the PRRB's decision under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* Because the court affirms the PRRB's decision, it denies the plaintiff's motion for summary judgment and grants the defendant's cross-motion for summary judgment.

## II.  BACKGROUND

### A.  The Medicare Program

Medicare provides health insurance to the elderly and disabled.  *See* 42 U.S.C. §§ 1395-1395cc.  The program entitles an eligible beneficiary to have payment made on his or her behalf for the care and services rendered by participating hospitals, termed "providers."  *See id.*  Providers, in turn, are reimbursed by insurance companies, known as "fiscal intermediaries," that have contracted with the Medicare administrator, the Centers for Medicare and Medicaid Services ("CMS").  *See* 42 U.S.C. § 1395h; 42 C.F.R. § 413.20.  The fiscal intermediary determines the amount of reimbursement due to the provider under Medicare law, including regulations published by CMS.  *See* 42 U.S.C. § 1395h; 42 C.F.R. § 413.20.

Providers obtain reimbursement by submitting cost reports showing the costs they incurred during the previous fiscal year and the portion of those costs to be allocated to Medicare.  *See* 42 C.F.R. § 413.20.  After receiving a provider's cost report, the fiscal intermediary may review and audit the report before determining the total amount of reimbursement to which the hospital is entitled.  *See id.* § 405.1803.  The fiscal intermediary memorializes its determination in a Notice of Program Reimbursement ("NPR").  *Id.*  The fiscal intermediary may reopen and revise a cost report within three years after the date of the NPR.  *Id.* § 405.1885.

In submitting cost reports, providers may be reimbursed for patient care as well as for certain "add-ons."  Am. Compl. ¶ 22.  For teaching hospitals, Medicare law provides an add-on

for indirect medical education ("IME") costs.[1]  *See* 42 U.S.C. § 1395ww(d)(5)(B).  One variable used to calculate the IME costs to be allocated to a provider is the number of full-time equivalent ("FTE") interns and residents who were trained at the hospital in that fiscal year.  *See id.*  A high FTE count yields a correspondingly high IME payment for the hospital.  *See id.*

As part of the Balanced Budget Act of 1997, Congress capped the amount that providers could be reimbursed for their IME costs.  *See id.*  More specifically, the Act provided that for cost reporting periods beginning on or after October 1, 1997, teaching hospitals would be limited to the number of IME FTEs "for the hospital's most recent cost reporting period ending on or before December 31, 1996" for the purpose of calculating IME payments.  *See id.*  In other words, the IME FTE count from the hospital's 1996 cost reporting period established the cap to be applied to IME FTE payments in subsequent years.[2]  *See* Am. Compl. ¶¶ 22-23.

### B.  Factual and Procedural History

#### 1.  Cost Report for Fiscal Year 1996

After receiving the cost report for fiscal year 1996 filed by the Tulsa Regional Medical Center ("the hospital"), the fiscal intermediary, Blue Cross of Oklahoma ("Blue Cross") issued an NPR on November 30, 2000.  *See id.* ¶ 27; Pl.'s Mot. for Summ. J. ("Pl.'s Mot.") at 6; Def.'s Cross-Mot. for Summ. J. & Opp'n to Pl.'s Mot. ("Def.'s Cross-Mot.") at 7.  Worksheet E of the

---

[1]  As explained in the Provider Reimbursement Review Board ("PRRB") decision issued on September 30, 2008, "the IME payment compensates teaching hospitals for higher-than-average operating costs that are associated with the presence and intensity of resident training in an institution but which cannot be specifically attributed to, and does not include, the costs of resident instruction."  Admin. R. at 30-31.

[2]  Although not relevant to this dispute, the hospital's cap was subsequently increased by 25 FTEs "[p]ursuant to a one-time opportunity to request a cap increase."  Pl.'s Mot. at 9 n.12.

1996 cost report referred to Workpaper M-7-2, which, while not itself included in the 1996 cost report, indicated that the cost report's IME FTE count, which was used to compute the 1996 reimbursement determination, was 88.14.  *See* Def.'s Cross-Mot. at 7-8, Pl.'s Mot. at 5-6, Pl.'s Opp'n to Def.'s Cross-Mot. & Reply in Support of Pl.'s Mot. ("Pl.'s Reply") at 5.  Meanwhile, Worksheet S-3, which was included in the 1996 cost report, listed an IME FTE count of 107.00.  Pl.'s Mot. at 6; *see also* Def.'s Cross-Mot. at 9.

The defendant maintains, and representatives of the plaintiff who testified at the PRRB hearing agreed, that the 107.00 IME FTE count listed on Worksheet S-3 was erroneous: it represented the hospital's direct Graduate Medical Education ("GME") FTE count, not its IME FTE count.  Admin. R. at 130 (Tr. of PRRB Hrg. Test. of Pl.'s Witness John Kellner at 60); *Id.* at 151 (Tr. of PRRB Hrg. Test. of Pl.'s Witness Pam Madole at 143-44).  The parties disagree, however, on whether the 1996 cost report was based on an IME FTE count of 88.14 or 107.00.  *See generally* Pl.'s Mot.; Def.'s Cross-Mot.  This is the key dispute underlying this case.

### 2. Cost Reports for Fiscal Years 1999 Through 2004

Pursuant to the Balanced Budget Act of 1997, the IME FTE cap, which was derived from the 1996 IME FTE count, was used to compute the hospital's IME payments beginning in fiscal year 1999.  Am. Compl. ¶ 26; Pl.'s Mot. at 6; Def.'s Cross-Mot. at 9.  When the hospital reported its IME payment for fiscal years 1999 through 2002, it applied a cap of 85.79 FTEs.[3]  Def.'s

---

[3]   The parties' briefs contain no explanation as to the disparity between the FTE count of 85.79, which was used in the revised NPRs for fiscal years 1999 through 2004, and the FTE count of 88.14, which was used to determine the 1996 IME FTE, other than a summary of the PRRB's explanation that the 88.14 IME FTE count was based on a 365-day year.  *See* Admin. R. at 34.  It appears that Blue Cross, erroneously believing that the 88.14 IME FTE count was based on a 375-day year, annualized the 88.14 count to 85.79 to reflect a 365-day year.  *See id.* at 605.  The PRRB determined that the 88.14 IME FTE count was in fact based on a 365-day year, and therefore should not have been adjusted downward to 85.79.  *See id.* at 34, 581-82.

Cross-Mot. at 9. When Blue Cross issued the NPR following the hospital's submission of the 1999 through 2001 cost reports, however, it adjusted the IME FTE cap upward to 104.15.[4] Am. Compl. ¶ 27; Pl.'s Mot. at 6-7; Def.'s Cross-Mot. at 9. The hospital purportedly contacted Blue Cross to notify it that the 104.15 IME FTE count was erroneous, but Blue Cross maintains that it received no correspondence from the hospital concerning the error. *See* Admin. R. at 32, 573. The hospital then filed cost reports for fiscal years 2003 and 2004 using the cap of 104.15 IME FTEs. Am. Compl. ¶ 29; Def.'s Cross-Mot. at 10. The hospital hired, trained and paid between 93.78 and 100.65 interns and residents from 1999 through 2004; accordingly, Medicare reimbursements to the hospital were not limited by the IME FTE cap of 104.15, but reimbursements would have been limited had a cap of 85.79 been imposed. Pl.'s Mot. at 2.

In late 2004 or early 2005, CMS identified the error in the IME FTE cap that had been applied for fiscal years 1999 through 2004. Consequently, in 2005, Blue Cross reopened the cost reports for fiscal years 1999 through 2004 and issued revised NPRs for those years, reducing the IME FTE cap from 104.15 to 85.79.[5] Am. Compl. ¶ 33; Def.'s Cross-Mot. at 10. As a result of the reduced cap, the hospital was required to repay approximately $2.5 million to the Medicare program. Pl.'s Mot. at 2.

### 3. The PRRB Proceeding

The plaintiff appealed Blue Cross's determination to the PRRB, arguing that by reopening the cost report as to each fiscal year from 1999 through 2004, Blue Cross had in fact

---

[4] The IME FTE count of 104.15 was derived from the 107.00 figure from Worksheet S-3 of the 1996 cost report, which Blue Cross then annualized to 104.15 because the 1996 cost report covered 375 days. Am. Compl. ¶ 27; Pl.'s Mot. at 6; Def.'s Cross-Mot. at 9-10.

[5] It is undisputed that Blue Cross reopened the 1999 through 2004 cost reports within the statutory three-year period after issuing the original NPRs for those fiscal years. *See* Admin. R. at 31.

impermissibly reopened the 1996 cost report beyond the three-year limit and revised the 1996 IME FTE count from 107.00 to 88.14.  Am. Compl. ¶ 35; Pl.'s Mot. at 9; Def.'s Cross-Mot. at 11.  The plaintiff asserted that the IME FTE cap that actually applied from 1999 through 2004 was 104.15, representing a 1996 IME FTE cap of 107.00 annualized to reflect a 365-day year.  *See* Admin. R. at 32.

Following the parties' submissions and a hearing held on January 24, 2008, the PRRB issued a decision on September 30, 2008, rejecting the plaintiff's position.  *See* Admin. R. at 29-34.  After summarizing the parties' positions, the PRRB observed that "[t]he primary issue in dispute is whether the IME base year FTE cap is properly derived from Worksheet S-3 or Worksheet E, Part A.  Neither the statute nor the regulation identifies where within the cost report the IME FTEs are to be found."  *Id.* at 33.  The PRRB ultimately held that the IME FTE count determined in the 1996 cost report was 88.14.  *Id.* at 33-34.  More specifically, it ruled that Blue Cross did not violate the three-year limitation on reopening a cost report because 88.14, rather than 107.00, was "the number 'determined' in the 1996 cost report.  Consequently, [Blue Cross's] action in December 2004 was not a reopening of the 1996 cost report but, rather, an application of the correct 1996 base year FTE cap."  *Id.* at 34.  In January 2009, the plaintiff commenced this action seeking judicial review of the PRRB determination.  *See generally* Am. Compl.  The court turns now to the applicable legal standards and the parties' arguments.

### III.  ANALYSIS

#### A.  Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  To determine which facts are "material," a court must look to the substantive law on which each claim rests.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action.  *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.  *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case."  *Celotex*, 477 U.S. at 322.  By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment.  *Id.*

The nonmoving party may defeat summary judgment through factual representations made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record," *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir.

1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006).

### B. Legal Standard for APA Review of the PRRB's Decision

Pursuant to the Medicare statute, the court reviews PRRB decisions in accordance with standard of review set forth in the APA. 42 U.S.C. § 1395oo(f)(1); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *Mem'l Hosp./Adair County Health Ctr., Inc. v. Bowen*, 829 F.2d 111, 116 (D.C. Cir. 1987). The APA requires a reviewing court to set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence in a case . . . otherwise reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706(2)(A), (E). The "arbitrary and capricious" standard and the "substantial evidence" standard "require equivalent levels of scrutiny."[6] *Adair County*, 829 F.2d at 117. Under both standards, the scope of review is narrow and a court must not substitute its judgment for that of the agency. *Motor Veh. Mfrs. Ass'n v. State Farm Mutual Ins. Co.*, 463 U.S. 29, 43 (1983); *Gen. Teamsters Local Union No. 174 v. Nat'l Labor Relations Bd.*, 723 F.2d 966, 971 (D.C. Cir. 1983). As long as an agency has "examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made," courts will not disturb the agency's action. *Md. Pharm., Inc. v. Drug Enforcement Admin.*, 133 F.3d 8, 16 (D.C. Cir. 1998). The burden of showing that the agency action violates the APA standards falls on the provider.

---

[6]  The D.C. Circuit has explained that the substantial evidence standard is a subset of the arbitrary and capricious standard. *Sithe/Indep. Power Partners v. Fed. Energy Regulatory Comm'n*, 285 F.3d 1, 5 n.2 (D.C. Cir. 2002). "While the substantial evidence test concerns support in the record for the agency action under review, the arbitrary and capricious standard is a broader test subsuming the substantial evidence test but also encompassing adherence to agency precedent." *Mem'l Hosp./Adair County Health Ctr., Inc. v. Bowen*, 829 F.2d 111, 117 (D.C. Cir. 1987).

*Diplomat Lakewood Inc. v. Harris*, 613 F.2d 1009, 1018 (D.C. Cir. 1979); *St. Joseph's Hosp. (Marshfield, Wis.) v. Bowen*, 1988 WL 235541, at *3 (D.D.C. Apr. 15, 1988).

In reviewing an agency's interpretation of its regulations, the court must afford the agency substantial deference, giving the agency's interpretation "controlling weight unless it is plainly erroneous or inconsistent with the regulation."[7] *Thomas Jefferson*, 512 U.S. at 512 (internal quotations omitted); *Presbyterian Med. Ctr. of Univ. of Pa. Health Sys. v. Shalala*, 170 F.3d 1146, 1150 (D.C. Cir. 1999); *see also Qwest Corp. v. Fed. Commc'ns Comm'n*, 252 F.3d 462, 467 (D.C. Cir. 2001) (stating that the court would reverse an agency's reading of its regulations only in cases of a clear misinterpretation). "So long as an agency's interpretation of ambiguous regulatory language is reasonable, it should be given effect." *Wyo. Outdoor Council v. United States Forest Serv.*, 165 F.3d 43, 52 (D.C. Cir. 1999). Where the regulations involve a complex, highly technical regulatory program such as Medicare, broad deference is "all the more warranted." *Thomas Jefferson*, 512 U.S. at 512 (internal quotations omitted); *Presbyterian Med. Ctr.*, 170 F.3d at 1151. As for interpretive guides, they are without the force of law but nonetheless are entitled to some weight. *Furlong v. Halala*, 156 F.3d 384, 393 (2d Cir. 1998).

### C. The Court Denies the Plaintiff's Motion for Summary Judgment and Grants the Defendant's Cross-Motion for Summary Judgment

The crux of the parties' dispute is which IME FTE count Blue Cross applied to the hospital for fiscal year 1996 – 107.00 or 88.14. *See generally* Am. Compl.; Pl.'s Mot.; Def.'s Cross-Mot. The plaintiff, making the same arguments before this court that it made unsuccessfully before the PRRB, contends that because "Worksheet S-3 is the only place the

---

[7] "[A court's] review in such cases is 'more deferential . . . than that afforded under *Chevron*.'" *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 52 (D.C. Cir. 1999) (quoting *Nat'l Med. Enters. Inc. v. Shalala*, 43 F.3d 691, 697 (D.C. Cir. 1995)).

IME FTE appears" in the 1996 cost report, Blue Cross applied an IME FTE count of 107.00 as indicated on Worksheet S-3. Pl.'s Mot. at 11. Following the assertion that the IME FTE count for 1996 was 107.00 to its logical conclusion, the plaintiff maintains that when Blue Cross reduced the IME FTE cap from 104.15 to 85.79 for fiscal years 1999 through 2004, it in fact revised the IME FTE count for fiscal year 1996 more than three years after the issuance of the NPR for that year, thus violating the three-year statute of limitations on reopening a cost report determination. *Id.* at 12-16. The plaintiff also complains that it made financial decisions in 2001 and 2002 based on the belief that Blue Cross had applied an IME FTE count of 107.00 in 1996. *Id.* at 22-23. In short, the plaintiff contends that the PRRB's determination that the IME FTE count for 1996 was 88.14 was arbitrary and capricious. *Id.* at 19-22.

The defendant counters that 88.14, not 107.00, was the IME FTE count upon which the hospital's IME reimbursement for fiscal year 1996 was calculated. Def.'s Cross-Mot. at 7. The fact that the 1996 IME FTE count was 88.14 is evident, the defendant argues, from Worksheet E of the cost report. *Id.* at 7-8. While Worksheet E does not explicitly state the IME FTE count, its calculations are based on an IME FTE count of 88.14, and it references Workpaper M-7-2, which clearly notes an IME FTE count of 88.14. *Id.* The fact that Worksheet S-3 erroneously listed an IME FTE count of 107.00, the defendant maintains, does not alter the fact that the true IME FTE count utilized to calculate the hospital's reimbursement for 1996 was 88.14. *Id.* at 8-9. In response to the plaintiff's detrimental reliance claim, the defendant avers that according to the hospital itself, the hospital contacted Blue Cross to notify it that the 107.00 IME FTE count was erroneous. *Id.* at 19-21. The hospital could not reasonably have relied on what it considered to

be an erroneous IME FTE count. Thus, the defendant urges the court to uphold the PRRB's determination that the correct IME FTE count for fiscal year 1996 was 88.14. *Id.* at 15-17.

Despite the labyrinthine statutory scheme at issue in this case – the complexity of which appears to have been compounded by both parties' notation and calculation errors – the court's task is simple. It must determine whether the PRRB acted reasonably when it concluded (1) that the IME FTE count for 1996 was properly derived from Worksheet E, rather than from Worksheet S-3; (2) that as a result, the correct IME FTE count for fiscal year 1996 was 88.14, as indicated on Worksheet E; (3) that the determination by Blue Cross in 2005 that the IME FTE count contained in the 1996 cost report was 88.14 did not constitute a reopening of that cost report, and (4) that the determination by Blue Cross therefore did not violate the three-year statute of limitations on reopening a cost report. *See* Admin. R. at 29-34. To make this determination, the court must assess whether the PRRB examined the relevant facts and articulated a rational connection between those facts and its conclusion, *see Md. Pharm., Inc.*, 133 F.3d at 16, affording the PRRB decision the uniquely high level of deference to which it is entitled by virtue of its expertise in the Medicare arena, *see Thomas Jefferson*, 512 U.S. at 512; *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1229 (D.C. Cir. 1994).

As the PRRB decision noted, and the parties concede, the applicable Medicare statute and regulations do not explicitly state where within the 1996 cost report the IME FTE counts are to be found. *See* Admin. R. at 33. The PRRB therefore conducted an independent assessment, based on the statutory and regulatory scheme, to determine whether the IME FTE count for fiscal year 1996 was 107.00, as stated on Worksheet S-3, or 88.14, as indicated on Worksheet E. *Id.* at 29-34. After summarizing the parties' competing arguments on the issue, *id.* at 32, the PRRB

concluded that the calculation of the IME reimbursement took place on Worksheet E, whereas Worksheet S-3 was intended to be used for statistical reporting purposes only, *id.* at 33. The PRRB also noted that it was undisputed that the FTE count noted on Worksheet S-3 "incorrectly related to the GME cap and . . . the IME base year payment was computed using 88.14 FTEs." *Id.* As a result, the PRRB concluded that the IME FTE count actually used to calculate the hospital's reimbursement for fiscal year 1996 was 88.14. *Id.* at 34.

The PRRB further determined that because Worksheet E of the 1996 cost report accurately indicated an IME FTE count of 88.14, Blue Cross did not "reopen" the 1996 cost report by concluding in 2005 that the IME FTE count for 1996 was 88.14, but instead merely applied the IME FTE indicated in the 1996 cost report. *Id.* Because Blue Cross never reopened the 1996 cost report, the three-year statute of limitations on reopening a cost report was not violated. *Id.* Finally, the PRRB addressed the plaintiff's reliance argument, concluding that although the hospital may have detrimentally relied on the erroneous IME FTE count, the PRRB was bound by the applicable statute and regulations, which indicated that the actual IME FTE for fiscal year 1996 was 88.14. *Id.*

By examining the relevant facts contained in the voluminous record, responding to the arguments raised by each party and articulating a detailed rationale for its determination, the PRRB surpassed the threshold required for the court to uphold its determination. *See Abington Crest Nursing & Rehab. Ctr. v. Sebelius*, 575 F.3d 717, 722-23 (D.C. Cir. 2009) (holding that "the bottom line [was that] the Secretary's interpretation of the Secretary's own regulation [was] neither 'plainly erroneous' nor 'inconsistent with the regulation,' and it therefore command[ed] [the court's] deference"); *Cmty. Care Found. v. Thompson*, 318 F.3d 219, 225-27 (D.C. Cir.

2003) (concluding that the Secretary's interpretation of the statute was permissible and supported by substantial evidence). Therefore, the court cannot conclude that the PRRB's decision was "arbitrary, capricious, an abuse of discretion, . . . otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E).

## IV.  CONCLUSION

For the foregoing reasons, the court denies the plaintiff's motion for summary judgment and grants the defendant's cross-motion for summary judgment. An Order consistent with this Memorandum Opinion is separately and contemporaneously issued this 12th day of January, 2010.

RICARDO M. URBINA
United States District Judge